IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LISA DOUGLAS, individually and as )
the parent and natural guardian of K.E., )
a minor, )
 )
                    Plaintiffs, )
 )
            v. )            Civil Action No. 10-1087
 )
BROOKVILLE AREA SCHOOL )
DISTRICT; SANDRA CRAFT, )
Superintendent of the Brookville Area )
School District; and KARIN HETRICK, )
 )
                    Defendants. )

MEMORANDUM OPINION AND ORDER OF COURT

I.      Introduction

        Before the Court for disposition are the Plaintiff's MOTION FOR SUMMARY
JUDGMENT (*ECF No. 55*), along with her supporting brief, supplement and exhibits (*ECF Nos. 56-58*), the Defendants' MOTION FOR SUMMARY JUDGMENT (*ECF No. 59*), along with their supporting brief and exhibits (*ECF No. 60*), and the responsive filings presented by the parties (*ECF Nos. 61-69*).  For the reasons that follow, the Defendants' motion for summary judgment will be granted, and the Plaintiff's motion for summary judgment will be denied in part.

II.     Background

        K.E.[1] is a female who was born on April 13, 1994.  ECF Nos. 59 & 68 at ¶ 6.[2]  She was enrolled as a sophomore at Brookville High School ("Brookville") during the 2009/2010 school year.  ECF Nos. 55 & 62 at ¶ 97.  Shannon Shaffer ("Shaffer"), a senior at Brookville, became acquainted with K.E. through band-related activities.  *Id.* at ¶ 123.  Karin Hetrick ("Hetrick"), a female, was a mathematics teacher and girls' softball coach at Brookville.  *Id.* at ¶ 97.  Hetrick's

---

[1] Federal Rule of Civil Procedure 5.2(a)(3) provides that references to "the name of an individual known to be a minor" may normally include only "the minor's initials."  FED. R. CIV. P. 5.2(a)(3).

[2] The parties combined their concise statements of material facts with their motions for summary judgment.  ECF Nos. 55 & 59.  Unless otherwise indicated, the numerical citations to those documents refer to the paragraphs contained in the concise statements of material facts, and the responses thereto, rather than to the paragraphs contained in the motions for summary judgment.

daughter, Brynna Hetrick ("Brynna"), was a senior at Brookville and one of Shaffer's best friends. *Id.* at ¶ 125.

K.E. was in a trigonometry class taught by Hetrick during the first semester of her sophomore year. ECF No. 59-25 at 12. She was also a member of the Brookville girls' soccer team. ECF Nos. 55 & 62 at ¶ 98. The team lost a playoff game to the Karns City girls' soccer team in November 2009. *Id.* at ¶ 99. Shortly thereafter, Hetrick sent K.E. a text message inquiring as to how the game had gone. *Id.* at ¶ 99. Hetrick used K.E.'s cellular telephone number to send the message. *Id.* The number had been given to Hetrick by Shaffer earlier that day. *Id.* Hetrick asked Shaffer about K.E.'s sexual orientation a few weeks after sending the text message. *Id.* at ¶ 100.

Hetrick and K.E. were both members of a band preparing to play in a school musical. ECF No. 55 at ¶ 102.[3] Brookville had a policy prohibiting teachers from using their personal vehicles to transport students except where specifically permitted by a policy promulgated by the School Board. *Id.* at ¶ 111. Nevertheless, Hetrick sometimes transported K.E. to and from band practice. *Id.* at ¶ 102. Hetrick also drove K.E. to and from the Young Men's Christian Association ("YMCA") in Brookville, where K.E. regularly exercised. *Id.* at ¶ 105. K.E. frequently visited Hetrick in her classroom around this same period of time. *Id.* at ¶ 103. They often played board games in Hetrick's classroom after classes had ended. *Id.* at ¶ 107. K.E. later started to take piano lessons at Hetrick's residence. *Id.* at ¶ 106. Hetrick transported K.E. to and from these lessons. *Id.*

Hetrick attended a basketball game on December 12, 2009. ECF No. 55-10 at 24. During the game, K.E. sent a text message indicating that her mother was not home and asking Hetrick to visit her house. *Id.* Hetrick proceeded to K.E.'s residence. *Id.* When Hetrick entered the residence, she was "embraced" by K.E. *Id.* K.E. proceeded to play music on her drums with Hetrick present. *Id.* During the ensuing three and a half months, K.E. and Hetrick frequently "embraced" and "kissed" each other in Hetrick's classroom. *Id.* at 24-25.

---

[3] Local Rule 56(C)(1)(b) provides that a party denying factual assertions contained in another party's concise statement of material facts must respond to those assertions by "setting forth the basis for the denial" of any fact that "is not admitted in its entirety." The Defendants have failed to comply with this requirement by denying that certain facts are "undisputed" without identifying the specific statements that are disputed. ECF No. 62. To the extent that the Plaintiff's factual allegations are not contradicted by the deposition testimony cited by the Defendants, they are deemed to be "undisputed" despite the Defendants' vague suggestions to the contrary.

Between January and March of 2010, K.E. and Hetrick had several intimate encounters inside of Hetrick's vehicle, Hetrick's house, and a storage room that was adjacent to a school gymnasium. *Id.* at 26-27. In addition to "kissing" and "embracing," some of these encounters involved "fondling" and the "inappropriate penetration" of K.E.'s vagina. *Id.* Hetrick sometimes fondled K.E. underneath her clothes. *Id.* at 27. K.E. occasionally disrobed during the encounters inside of Hetrick's vehicle. *Id.* K.E. and Hetrick engaged in intimate "kissing," "hugging" or "touching" on 50 to 60 different occasions. *Id.* at 29. They frequently exchanged text messages and "inappropriate" photographs on their cellular telephones during this same period of time. *Id.*

Brynna started to notice that K.E. was constantly in Hetrick's classroom during study halls and after school. ECF No. 55 at ¶ 128(f). Brynna told Shaffer that she felt like K.E. was "replacing" her as Hetrick's daughter. *Id.* Shaffer discussed the situation with Timothy F. Stevenson ("Stevenson"), Brookville's music teacher and band director, on three separate occasions. *Id.* at ¶ 128(c).

On March 22, 2010, Brynna went to Hetrick's classroom in order to get some money. *Id.* at ¶ 132. Hetrick was not in the room, but her cellular telephone was sitting on her desk. *Id.* Brynna accessed the text messages on the phone and observed that several sexually suggestive messages had been exchanged between her mother and K.E. *Id.* At that time, Hetrick and K.E. were inside of the storage room of the gymnasium. *Id.* Brynna proceeded to the gymnasium and saw her mother and K.E. coming out of the storage room. *Id.* at ¶ 133. Having become aware of the situation, Brynna "stormed" out of the school and showed one of the text messages to Shaffer. ECF No. 55-12 at 32. The message, which had been sent by Hetrick to K.E., referred to an individual who was "excited" and "wet." ECF No. 59-70 at 13. Brynna then telephoned her older sister, Tia Hetrick ("Tia"), and insisted that she speak with Shaffer. ECF No. 55-12 at 32. At Brynna's request, Shaffer described the content of the text message to Tia. *Id.* After speaking with Shaffer, Tia contacted Hetrick and confronted her about her relationship with K.E. *Id.*

Brynna and Shaffer went to the residence of their friend, Logan Sneel ("Sneel"), to spend the night. ECF No. 59-70 at 13. Hetrick sent a text message to Shaffer advising that her family was aware of the relationship, that she was going to speak with K.E.'s parents about the matter, and that she was prepared to submit her resignation to Brookville. *Id.* at 14. Hetrick apparently

sent the text message to Shaffer after learning from her husband that Brynna was with Shaffer at Sneel's residence.  *Id.*  K.E. did not know that Brynna had uncovered the relationship until a few hours later, when Hetrick sent her a text message stating that the relationship would have to end.  ECF No. 62-2 at 42.  Later that evening, Shaffer contacted K.E. and informed her that Brynna had discovered the inappropriate text message on Hetrick's phone.  *Id.*

At 7:40 A.M. on the morning of March 23, 2010, Shaffer met with Stevenson, described the content of the text messages sent by Hetrick, and advised that Hetrick's relationship with K.E. had been inappropriate.  ECF No. 55 at ¶ 135.  Shortly thereafter, K.E. spoke with Shaffer and acknowledged that her relationship with Hetrick had been sexual in nature.  *Id.* at ¶ 136.  Shaffer encouraged K.E. to speak with Stevenson and escorted her to his office.  *Id.*  K.E. met with Stevenson at lunchtime and admitted that her relationship with Hetrick had involved hand-holding, kissing and touching.  *Id.* at ¶ 137.

Stevenson reported the matter to Keith Wolfe ("Wolfe"), Brookville's principal, at 9:20 A.M. on the morning of March 24, 2010.  *Id.* at ¶ 140.  After meeting with Stevenson, Wolfe and Sandra Craft ("Craft"), Brookville's superintendent, pulled Shaffer out of class and asked her what she knew about K.E.'s relationship with Hetrick.  *Id.* at ¶ 142.  Shaffer described the text messages that Brynna had discovered on Hetrick's phone and stated that K.E. and Hetrick had engaged in intimate activities.  *Id.* at ¶ 143.  Wolfe and Craft went to Hetrick's classroom and advised that they would be speaking with her at 12:25 P.M. about her relationship with a student.  *Id.* at ¶ 145.

K.E. was in a class being taught by Amanda Carrico ("Carrico").  *Id.* at ¶ 147.  Hetrick telephoned Carrico and asked for an opportunity to speak with K.E. in a nearby hallway.  *Id.*  Carrico honored the request and instructed K.E. to meet Hetrick in the hallway.  *Id.*  Hetrick and K.E. proceeded to discuss the matter.  *Id.* at ¶ 148.  After speaking with K.E., Hetrick decided to meet with Wolfe and Craft at 11:20 A.M. instead of waiting until 12:25 P.M.  *Id.* at ¶ 150.  During the meeting, Hetrick acknowledged that her relationship with K.E. had been inappropriate.  *Id.* at ¶¶ 150-151.  Craft informed Hetrick that she was being placed on administrative leave.  ECF No. 62 at ¶ 146.

That same day, Officer Vince Markle ("Markle"), a member of the Brookville Police Department, stopped by the school and spoke with Wolfe.  ECF No. 55 at ¶ 155.  Wolfe informed Markle that the school was conducting an investigation but did not provide any details.

*Id.*  Wolfe and Craft discussed the situation with K.E. at approximately 1:50 P.M.  *Id.* at ¶ 157. K.E. confirmed that her relationship with Hetrick had been inappropriate.  *Id.*  Hetrick telephoned K.E.'s mother, Lisa Douglas ("Douglas"), and apologized for "hugging" her daughter.  ECF No. 62-1 at 41.  After learning from her husband that K.E. needed a ride home, Douglas drove to the school and found K.E. in a room with Wolfe and Craft.  *Id.* at 42.  K.E. left the room at Douglas' request.  *Id.*  Shortly thereafter, Douglas was informed of the relationship that had existed between K.E. and Hetrick.  *Id.*  Wolfe and Craft told Douglas that the relationship had been confirmed to them by Hetrick, Brynna and Shaffer, but that K.E. had not provided them with detailed information.  *Id.*  Douglas took K.E. home after conferring with Wolfe and Craft.  *Id.*

Hetrick presented Brookville with her letter of resignation on March 25, 2010.  ECF No. 62 at ¶ 154.  Her resignation was immediately accepted.  *Id.* at ¶ 155.  Douglas reported the relationship to the Pennsylvania State Police ("PSP") that same day.  ECF No. 55 at ¶ 159.  The PSP referred the matter to Markle.  ECF No. 55 at ¶ 160.  Markle proceeded to conduct an investigation.  *Id.* at ¶ 162.  According to an affidavit of probable cause prepared in support of criminal charges later filed against Hetrick, Markle and Officer Mickey Stormer ("Stormer") went to Hetrick's residence on March 25, 2010, to conduct an interview.  ECF No. 55-16 at 23. After signing a statement acknowledging that she had been read her rights in accordance with *Miranda v. Arizona*, 384 U.S. 436, 467-479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), Hetrick agreed to speak with Markle and Stormer.  *Id.*  She admitted that she had inserted her fingers into K.E.'s vagina on at least one occasion.  *Id.*  Hetrick also stated that, on ten to twelve different occasions, she had touched K.E.'s breasts and vagina while K.E. was completely unclothed.  *Id.*

Later that day, K.E. and Douglas met with Markle and Stormer at the Brookville Police Station.  *Id.*  K.E. described incidents in which Hetrick had rubbed her vagina for five to ten minutes at a time.  *Id.* at 24.  She stated that Hetrick had touched her breasts and buttocks near the school gymnasium on March 22, 2010.  *Id.*  K.E. also provided Markle with a flash drive that she had used to download four "nude or partially nude" photographs that had been forwarded to her by Hetrick.  *Id.*  In addition, K.E. advised Markle and Stormer that she had forwarded ten "nude or partially nude" photographs of herself to Hetrick's phone.  *Id.*  Hetrick was ultimately charged with aggravated indecent assault,[4] indecent assault,[5] indecent exposure,[6] corrupting the

---

[4] 18 PA. CONS. STAT. § 3125(a)(8).

morals of a minor,[7] disseminating sexually explicit materials to a minor,[8] possession of child pornography,[9] and having unlawful contact with a minor.[10]  ECF No. 55-16 at 18-24.

During his investigation, Markle obtained a warrant authorizing a search of Hetrick's cellular telephone.  ECF No. 55-16 at 31.  Nonetheless, he was unable to find the phone, and Hetrick advised that it had been lost "in the woods."  *Id.*  Although Hetrick's phone was never located, Markle retrieved some of the messages that he was seeking from K.E.'s phone.  *Id.*

Douglas commenced this action against Hetrick and the Brookville Area School District ("District") on August 18, 2010, alleging violations of the Fourteenth Amendment to the United States Constitution, Title IX of the Education Amendments of 1972 ("Title IX") [20 U.S.C. § 1681 *et seq.*], and the common law of Pennsylvania respecting the tort of battery.  ECF No. 1 at ¶¶ 16-38.  Meanwhile, the criminal proceedings against Hetrick continued.  On February 7, 2011, Hetrick pleaded "guilty" to three counts of aggravated indecent assault pursuant to the terms of a plea agreement.  ECF Nos. 55 & 62 at ¶ 121.  Douglas filed an amended complaint in this action on March 14, 2011, and added Craft as a defendant.  ECF No. 33.  On May 4, 2011, the Court of Common Pleas of Jefferson County, Pennsylvania, sentenced Hetrick to a period of incarceration of five to ten years followed by thirty years probation.  ECF Nos. 55 & 62 at ¶ 121.

Douglas filed a motion for summary judgment on August 24, 2011.  ECF No. 55.  The District and Craft filed a motion for summary judgment two days later.  ECF No. 59.  These motions are the subject of this memorandum opinion.

## III.     Standard of Review

Summary judgment may only be granted where the moving party shows that there is no genuine dispute as to any material fact, and that a judgment as a matter of law is warranted.  FED. R. CIV. P. 56(a).  Pursuant to Federal Rule of Civil Procedure 56, the Court must enter summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  In evaluating the evidence, the Court must interpret the facts in the light most favorable to the non-

---

[5] 18 PA. CONS. STAT. § 3126(a)(8).
[6] 18 PA. CONS. STAT. § 3127(b).
[7] 18 PA. CONS. STAT. § 6301(a)(1).
[8] 18 PA. CONS. STAT. § 5903(c)(1).
[9] 18 PA. CONS. STAT. § 6312(d).
[10] 18 PA. CONS. STAT. § 6318(a)(4).

moving party, drawing all reasonable inferences in his or her favor.  *Watson v. Abington Township*, 478 F.3d 144, 147 (3d Cir. 2007).  The burden is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact.  *Conoshenti v. Public Service Electric & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004).  A dispute is "genuine" if the evidence is such that a reasonable trier of fact could return a verdict for the non-moving party.  *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005).  Where the non-moving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the non-moving party's burden of proof.  *Celotex Corp.*, 477 U.S. at 322.  Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories in order to show that there is a genuine issue of material fact for trial.  *Id.* at 324.  The non-moving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings.  *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

## IV.   Discussion

Douglas' amended complaint pleads five counts.  In Counts I and II, Douglas asserts substantive due process and Title IX claims against the District.  ECF No. 33 at ¶¶ 18-32.  In Counts III and IV, she asserts substantive due process and battery claims against Hetrick.  *Id.* at ¶¶ 33-40.  In Count V, Douglas attempts to hold Craft liable for the substantive due process violations allegedly committed by Hetrick.  *Id.* at ¶¶ 41-57.

Douglas moves for summary judgment with respect to all of her claims.  ECF No. 55.  The District and Craft move for summary judgment with respect to Counts I, II and V of the amended complaint.  ECF No. 59.  Hetrick, who is represented by separate counsel, has neither responded to Douglas' motion for summary judgment nor filed any motion on her own behalf.

### A.   The Title IX Claim Against the District

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."  20 U.S.C. § 1681(a).  Although a recipient of federal financial assistance can lose its federal funding for failing to comply with Title IX's anti-discrimination requirement, Title IX's enforcement

provision provides that "no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means."  20 U.S.C. § 1682.  This limitation on the enforcement mechanism created by Congress evinces a legislative intent to give an offending entity an opportunity to end its discriminatory practices before its federal financial support is terminated.

In *Cannon v. University of Chicago*, 441 U.S. 677, 709-717, 90 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the United States Supreme Court held that private victims of sex-based discrimination could seek redress under Title IX even though the applicable statutory language provided only for the discontinuation of an offending entity's federal financial assistance.  Congress subsequently validated the holding in *Cannon* by abrogating the States' Eleventh Amendment immunity in actions brought under Title IX by private individuals.  Pub. L. No. 99-506, § 1003; 100 Stat. 1807, 1845 (1986); 42 U.S.C. § 2000d-7(a).  In light of this action by Congress, it is "beyond dispute" that private individuals can sue recipients of federal financial assistance under Title IX.  *Alexander v. Sandoval*, 532 U.S. 275, 280, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001).  The Supreme Court held in *Franklin v. Gwinnet County Public Schools*, 503 U.S. 60, 76, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), that individuals can seek monetary relief under Title IX in actions brought to redress sex-based discrimination.

Title IX's proscription of sex-based "discrimination" is broad enough to encompass "sexual harassment."  *Jackson v. Birmingham Board of Education*, 544 U.S. 167, 173-174, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005).  A teacher engages in a prohibited form of "discrimination" when he or she "sexually harasses and abuses a student."  *Franklin*, 503 U.S. at 75.  A Title IX action, however, can be brought only against a recipient of federal financial assistance.  *Mwabira-Simera v. Howard University*, 692 F.Supp.2d 65, 70 (D.D.C. 2010); *Johnny's Icehouse, Inc. v. Amateur Hockey Association of Illinois*, 134 F.Supp.2d 965, 970-971 (N.D.Ill. 2001).  The recipient of federal financial assistance in this situation is ordinarily the school or educational entity that employs the offending teacher.  A plaintiff cannot invoke Title IX to sue an individual teacher or school official.  *Fitzgerald v. Barnstable School Committee*, 555 U.S. 246, 257, 129 S.Ct. 788, 172 L.Ed.2d 582 (2009).

In *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 277, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998), the Supreme Court held that a student seeking to recover damages from

a school district for a teacher's misconduct must demonstrate that an official of the district with the "authority to institute corrective measures on the district's behalf" had "actual notice" of the prohibited discrimination, and that the official was "deliberately indifferent" to the district's obligations under Title IX.  The Supreme Court reasoned that since a federal agency could not terminate a school district's federal funding without advising the "appropriate person or persons" of the discrimination and determining that compliance with Title IX could not be "secured by voluntary means," it would frustrate the purposes of the enforcement mechanism to permit a victim of sexual harassment to proceed against a school district on a theory of *respondeat superior* or "constructive notice."  *Gebser*, 524 U.S. at 285-291.  Speaking through Justice O'Connor, the Supreme Court explained:

> The administrative enforcement scheme presupposes that an official who is advised of a Title IX violation refuses to take action to bring the recipient into compliance.  The premise, in other words, is an official decision by the recipient not to remedy the violation.  That framework finds a rough parallel in the standard of deliberate indifference.  Under a lower standard, there would be a risk that the recipient would be liable in damages not for its own official decision but instead for its employees' independent actions.

*Id.* at 290-291.  Since a school district's liability under Title IX is premised on a district official's "actual notice" of the discrimination, the offending teacher's own notice of his or her actions cannot be imputed to the district.  *Id.* at 291.

The standard for determining whether a school district is liable under Title IX for sexual harassment was further delineated in *Davis v. Monroe County Board of Education*, 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999).  In *Davis*, the Supreme Court clarified that the sex-based "discrimination" prohibited under Title IX was broad enough to encompass one student's harassment of another student, and that the framework established in *Gebser* applied with equal force to a situation in which the harasser was "a student rather than a teacher."  *Davis*, 526 U.S. at 643.  The Supreme Court also declared that a cause of action for sexual harassment was cognizable under Title IX only where the harassment at issue was "so severe, pervasive, and objectively offensive that it effectively bar[red] the victim's access to an educational opportunity or benefit."  *Id.* at 633.  It was noted that harassing conduct engaged in by a teacher was more likely to be actionable than was harassing conduct engaged in by a student, since "[t]he relationship between the harasser and the victim" had a direct impact on the extent to which the

harasser's misconduct could "be said to breach Title IX's guarantee of equal access to educational benefits and to have a systemic effect on a program or activity." *Id.* at 653.

Under Pennsylvania law, a person commits the crime of "aggravated indecent assault" when he or she "engages in penetration, however slight, of the genitals or anus of a complainant with a part of the person's body for any purpose other than good faith medical, hygienic or law enforcement procedures" and "the complainant is less than 16 years of age and the person is four or more years older than the complainant and the complainant and the person are not married to each other." 18 PA. CONS. STAT. § 3125(a)(8). Hetrick was 42 years old when she engaged in intimate activities with K.E.[11] ECF No. 55-16 at 20-21. K.E. was 15 years old at the time of the sexual encounters. *Id.* Hetrick's conviction for aggravated indecent assault conclusively establishes that she digitally penetrated K.E.'s vagina. *M.B. v. City of Philadelphia*, 128 Fed.Appx. 217, 225-226 (3d Cir. 2005)(unpublished). Given the age difference between the two individuals, Hetrick also committed the offense of indecent assault when she fondled K.E.'s breasts and genital area. 18 PA. CONS. STAT. § 3126(a)(8). The relevant statutory prohibitions are designed "to protect minors younger than 16 years of age from older teenage and adult sexual aggressors." *Commonwealth v. Albert*, 758 A.2d 1149, 1154 (Pa. 2000).

Title IX does not purport to establish the minimum age at which a minor is deemed to be capable of consenting to sexual activities with an older individual. Instead, Title IX prohibits certain forms of sex-based "discrimination" in the educational context. 20 U.S.C. § 1681(a). Where an individual's interactions with another person are sexual in nature, it is reasonable to assume that those interactions are motivated, at least in part, by the other person's "sex." *Oncale v. Sundower Offshore Services, Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). In order to constitute "harassment," however, sexually-oriented conduct must be "unwelcome." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 68, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). While Title IX prohibits certain forms of "sexual harassment," it is not implicated by every form of "sexual misconduct" declared to be illegal under state law. *Benefield v. Board of Trustees of the University of Alabama*, 214 F.Supp.2d 1212, 1220 (N.D.Ala. 2002). Some federal courts have suggested that sexually-oriented conduct directed toward an underage individual should not be presumed to be "unwelcome" simply because state criminal statutes classify that individual as someone who is too young to consent to sexual activity. *Id.* at 1217-1220; *R.L.R. v. Prague*

---

[11] The documentary record indicates that Hetrick was born on November 30, 1967. ECF No. 55-16 at 20-21.

*Public School District I-103*, 838 F.Supp. 1526, 1534 (W.D.Okla. 1993).  In *Chancellor v. Pottsgrove School District*, 501 F.Supp.2d 695, 708 (E.D.Pa. 2007), the United States District Court for the Eastern District of Pennsylvania determined that a high school student assigned to a teacher's class had lacked the capacity to "welcome" that teacher's "physical sexual conduct." Nonetheless, the District Court later held that the student's "voluntary participation in sexual activities with the teacher" could be considered for the purpose of determining whether the "harassment" in question had been sufficiently "severe, pervasive and objectively offensive" to be actionable under Title IX.  *Chancellor v. Pottsgrove School District*, 529 F.Supp.2d 571, 574 (E.D.Pa. 2008).

The Court notes that while K.E. was enrolled in a trigonometry class taught by Hetrick during the first semester of her sophomore year, she was no longer in Hetrick's class when the second semester began.[12]  ECF No. 59-25 at 11-12.  Hetrick's relationship with K.E. did not become sexual until January 2010.  ECF No. 55-10 at 26-27; ECF No. 62-2 at 26-27.  It is also worth noting that K.E. was not a member of the Brookville girls' softball team, which was coached by Hetrick.  ECF No. 62-2 at 28-29.  K.E. testified that she had understood her interactions with Hetrick to be "inappropriate," but that she had declined to speak up about the matter for fear that Hetrick would lose his job.  *Id.* at 31.  K.E.'s comments to Stevenson on March 23, 2010, evidently left him with the impression that she did not want disciplinary action to be taken against Hetrick.  ECF No. 59-72 at 32-33.  Under these circumstances, it is not clear whether Hetrick's actions in relation to K.E. constituted "unwelcome" harassment.[13]  *Benefield*, 214 F.Supp.2d at 1217-1220.  In any event, the Court will assume *arguendo* that K.E. was "subjected to discrimination" within the meaning of Title IX when Hetrick fondled her breasts and genital area.  20 U.S.C. § 1681(a).

In order to advance her Title IX claim against the District, Douglas must point to evidence suggesting that an official with the "authority to institute corrective measures" had "actual notice" of the ongoing discrimination, and that the official was "deliberately indifferent" to the District's obligation to stop Hetrict's misconduct.  *Gebser*, 524 U.S. at 277. Pennsylvania's Child Protective Services Law ("CPSL") [23 PA. CONS. STAT. § 6301 *et seq.*]

---

[12] Carrico testified that while her precalculus class had been a year-long course, Hetrick's trigonometry class had been offered only during the first semester.  ECF No. 59-25 at 12.  K.E. apparently took both classes during her sophomore year.  *Id.*

[13] Sexual advances can constitute "unwelcome" harassment even if they lead to "voluntary" sexual activities. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 68, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

provides that "a school employee who has reasonable cause to suspect, on the basis of professional or other training or experience, that a student coming before the school employee in the employee's professional or official capacity is a victim of serious bodily injury or sexual abuse or sexual exploitation by a school employee shall immediately contact the [school] administrator." 23 PA. CONS. STAT. § 6352(a)(1). Brookville has implemented this legislative mandate by promulgating Policy No. 806, which requires a "school employee" who has "reasonable cause to suspect" that a student is a victim of "serious bodily injury," "sexual abuse" or "sexual exploitation" to immediately contact the principal and notify him or her of the situation. ECF No. 55-13 at 37. Shaffer testified that she had spoken with Stevenson as early as December 2009 about text messages between Hetrick and K.E. stating, "I love you." ECF No. 59-70 at 9. Shaffer learned of these messages while speaking with Brynna. *Id.* at 8-10. Hetrick's close relationship with K.E. apparently caused Brynna to feel like she was being "replaced" as Hetrick's daughter. *Id.* at 10. When questioned about the matter during a deposition, Stevenson acknowledged that he had overheard conversations between Shaffer and Brynna about the text messages. ECF No. 59-72 at 28. Shaffer and Stevenson both testified that they had not believed the relationship between Hetrick and K.E. to be sexual prior to Brynna's discovery of the graphic text message on March 22, 2010. ECF No. 59-70 at 8-9; ECF No. 59-72 at 28. In any event, Douglas argues that Stevenson had enough information before that date to call the situation to Wolfe's attention. ECF No. 56 at 19-20; ECF No. 61 at 8-9. Wolfe testified that Stevenson had violated Policy No. 806 by failing to report the matter sooner. ECF No. 59-76 at 7. Douglas relies on Wolfe's testimony to buttress her Title IX claim. ECF No. 56 at 19-20; ECF No. 61 at 8-9.

The argument advanced by Douglas is unavailing. The duty to report established by the CPSL and Policy No. 806 extends to every "school employee." 23 PA. CONS. STAT. § 6352(a)(1); ECF No. 55-13 at 37. Only an individual with the "authority to institute corrective measures" can be fairly characterized as an "appropriate person" under *Gebser*. *Gebser*, 524 U.S. at 277. In *Warren v. Reading School District*, 278 F.3d 163, 173 (3d Cir. 2002), the United States Court of Appeals for the Third Circuit held that a guidance counselor who had sometimes assumed the duties of the principal when the principal was away could not be regarded as an "appropriate person" when the principal was present. It was determined that the guidance counselor had not been "cloaked with sufficient authority" to be an "appropriate person" during

12

the relevant period of time.  *Warren*, 278 F.3d at 173.  The Court of Appeals explained that a school's principal was ordinarily high enough on the institutional hierarchy to base a school district's Title IX liability on his or her "actual knowledge" of discrimination and "deliberate indifference" thereto.  *Id.* at 170.  Since the guidance counselor had not been acting as the principal during the period of time in question, however, the Court of Appeals concluded as a matter of law that he was not an "appropriate person" for the purpose of Title IX liability.  *Id.* at 172-174.  Douglas' contention that the category of "appropriate persons" recognized in *Gebser* is broad enough to include every "school employee" who is required to report cases of suspected child abuse under state or local law is foreclosed by the holding in *Warren*.[14]  There is nothing in the record which suggests that Stevenson had the "authority to institute corrective measures" against Hetrick.  *Gebser*, 524 U.S. at 277.  Consequently, his alleged knowledge of the "discrimination" against K.E. cannot be imputed to the District.  *Warren*, 278 F.3d at 173-174.

Even if Stevenson could be treated as an "appropriate person" under Title IX, Douglas' claim would still fail for a different reason.  Where the relevant "discrimination" consists of a sexual relationship between a teacher and a student, an "appropriate person" must have "actual notice" of the relationship itself, and be deliberately indifferent to the situation, before the relevant school district can be subjected to Title IX liability.  *Bostic v. Smyrna School District*, 418 F.3d 355, 360-361 (3d Cir. 2005).  It does not suffice for Douglas to show that Stevenson was aware of facts consistent with the "possibility" that Hetrick and K.E. were involved in a sexual relationship.  *Id.*  In this context, a recipient of federal funding is liable under Title IX only where it is deliberately indifferent to "known acts" of "discrimination."  *Davis*, 526 U.S. at 643.  Since Stevenson did not *know* the extent of Hetrick's relationship with K.E. prior to March 23, 2010, his awareness of the text messages prior to that date would not have established the District's liability under Title IX even if he had been an "appropriate person" under the circumstances of this case.  *Bostic*, 418 F.3d at 360-361.

Douglas faults Wolfe and Craft for failing to prevent contact between Hetrick and K.E. after learning of their inappropriate relationship on the morning of March 24, 2010.  ECF No. 56

---

[14] If every person employed by the District could be characterized as an "appropriate person" merely by virtue of the CPSL and Policy No. 806, Hetrick would also have to be regarded as an "appropriate person."  Such a result would cause liability under Title IX to collapse into something akin to *respondeat superior* liability.  *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 285-291, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998).  The Supreme Court has clearly rejected that approach.  *Id.* at 291 (remarking that "the knowledge of the wrongdoer" was "not pertinent to the analysis").

at 20; ECF No. 61 at 9. After being told to meet with Wolfe and Craft no later than 12:25 P.M., Hetrick telephoned Carrico and asked for an opportunity to speak with K.E. ECF No. 59-25 at 13. Carrico instructed K.E. to meet Hetrick in the hallway. *Id.* at 14. K.E. exited Carrico's classroom and discussed the situation with Hetrick. *Id.* Hetrick apparently asked K.E. to dissuade Douglas from initiating a criminal investigation. ECF No. 62-2 at 46-47. K.E. returned to Carrico's classroom after speaking with Hetrick. *Id.* at 47. Carrico inquired as to whether K.E. was alright, and K.E. responded in the affirmative. ECF No. 59-25 at 14. Carrico had no knowledge of the preexisting sexual relationship when she asked K.E. to meet Hetrick in the hallway. *Id.* Although Douglas does not allege that Hetrick touched K.E. inappropriately on March 24, 2010, she contends that the District is liable under Title IX for failing to prevent the meeting. ECF No. 56 at 20; ECF No. 61 at 9.

This argument posited by Douglas is not persuasive. The Court understands the "deliberate indifference" prong of the *Gebser* framework to incorporate a causation requirement. *Gebser*, 524 U.S. at 291 ("Comparable considerations led to our adoption of a deliberate indifference standard for claims under § 1983 alleging that a municipality's actions in *failing to prevent* a deprivation of federal rights was the *cause* of the violation.")(emphasis added). When an "appropriate person" knows of sex-based discrimination and refuses to remedy the situation, his or her "deliberate indifference" inevitably *causes* the discrimination to continue. *Id.* at 290-291. Title IX's statutory enforcement mechanism provides a recipient of federal financial assistance with an opportunity to end discrimination "by voluntary means" before prospective funding is jeopardized. 20 U.S.C. § 1682. The standard adopted in *Gebser* was "fashioned along the same lines." *Gebser*, 524 U.S. at 290. Douglas cannot hold the District liable under Title IX without establishing that the "deliberate indifference" of an "appropriate person or persons" *caused* K.E. to "be subjected to discrimination." 20 U.S.C. §§ 1681(a), 1682; *Davis*, 526 U.S. at 650-653. Given that K.E. was not "subjected to discrimination" during her meeting with Hetrick on March 24, 2010, the District's alleged failure to prevent that engagement cannot serve as the basis for Title IX liability.

The CPSL provides that a school administrator or employee "shall report immediately to law enforcement officials and the appropriate district attorney any report of serious bodily injury or sexual abuse or sexual exploitation alleged to have been committed by a school employee against a student." 23 Pa. Cons. Stat. § 6353(a). Policy No. 806 implements this mandate by

14

requiring a school principal "who has independent cause to suspect injury or abuse" to immediately call the matter to the attention of "law enforcement officials and the appropriate district attorney." ECF No. 55-13 at 37.  Wolfe testified that he and Craft had contacted the Jefferson County District Attorney's Office shortly after learning that Hetrick had abused K.E. ECF No. 59-76 at 19.  He also stated that he had spoken with Markle about the matter at approximately 4:00 P.M. on March 24, 2010.  *Id.* at 21.  Markle testified that Wolfe had not provided him with any names or details during the course of this discussion.  ECF No. 59-68 at 7.  Douglas contacted the PSP on March 25, 2010, and reported Hetrick's illicit sexual relationship with K.E.  ECF No. 62-1 at 44.  The PSP referred the case to Markle.  ECF No. 59-68 at 7.  The ensuing criminal investigation appears to have been triggered by Douglas' contact with the PSP rather than by reports made by Wolfe or Craft.  ECF No. 55-16 at 23.  The parties apparently disagree as to whether the District's actions satisfied the requirements of the CPSL and Policy No. 806.  ECF No. 56 at 20; ECF No. 63 at 19.  That issue, however, is not material to Douglas' Title IX claim.  The District's alleged failure to conform its conduct to the specific requirements of Pennsylvania law and Policy No. 806 did not constitute actionable "discrimination" within the meaning of Title IX.[15]  *Gebser*, 524 U.S. at 291-292.

Douglas complains that "evidence was lost" because of the District's failure to isolate Hetrick and contact law enforcement personnel immediately after learning that Hetrick's relationship with K.E. had been sexual.  ECF No. 56 at 20; ECF No. 61 at 9.  The Court assumes that Hetrick's phone may have been secured if Wolfe or Craft had acted sooner.  Title IX, however, did not require the District to take a particular "form of disciplinary action" against Hetrick.  *Davis*, 526 U.S. at 649.  Instead, Title IX merely required the District to respond to Hetrick's known acts of "discrimination" in a manner that was not "clearly unreasonable."  *Id.* at 648-649.  The relevant question is whether Wolfe and Craft took reasonable actions to stop Hetrick's discriminatory conduct.  *Warren*, 278 F.3d at 170-171.  Hetrick was placed on administrative leave immediately after admitting that she had touched K.E. inappropriately.  ECF No. 59-26 at 27.  She submitted her resignation the next day.  ECF No. 59-17.  Craft accepted

---

[15] The District's "Guide to Safety and Security" instructs school officials not to question the victim of a sex offense prior to the arrival of an investigating officer and one of the victim's parents.  ECF No. 55-19 at 43.  Douglas contends that Wolfe and Craft contravened this protocol by questioning K.E. prior to her arrival at the school.  ECF No. 56 at 20; ECF No. 61 at 9.  Nevertheless, the alleged failure of Wolfe and Craft to properly implement the District's internal policies did not constitute a violation of Title IX.  *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 291-292, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998).

Hetrick's resignation and instructed her to return any school equipment or materials in her possession.  ECF No. 59-18.  The actions taken by Wolfe and Craft ended Hetrick's discriminatory conduct.  These actions were taken almost immediately after Stevenson called the illicit relationship to the attention of the "appropriate persons."  Title IX required the District to do nothing more.  *Davis*, 526 U.S. at 648-649.

The record indicates that Hetrick touched K.E.'s breasts and buttocks on March 22, 2010. ECF No. 55-16 at 24.  It was on that occasion that Brynna discovered the illicit relationship and reported her mother's misconduct to Shaffer and Tia.  ECF No. 55 at ¶¶ 132-134.  Nothing in the record suggests that K.E. was ever "subjected to discrimination" again.  20 U.S.C. § 1681(a). Stevenson did not have "actual notice" of Hetrick's relationship with K.E. until March 23, 2010. *Bostic*, 418 F.3d at 361 (explaining that a "possibility" of discrimination "cannot be equated with" a "known act" of discrimination).  He called the matter to Wolfe's attention on the morning of March 24, 2010.[16]  ECF No. 55 at ¶ 140.  Wolfe was the first "appropriate person" to learn that Hetrick had "discriminated" against K.E.  *Warren*, 278 F.3d at 170-171.  He immediately contacted Craft and began an investigation.  ECF No. 59-76 at 15-17.  Hetrick was confronted with the allegations against her and placed on administrative leave later that day. ECF No. 59-26 at 27.  Even if the remedial actions taken by Wolfe and Craft were imperfect in some respects, they were not "clearly unreasonable in light of the known circumstances."  *Davis*, 526 U.S. at 648.

On the basis of the existing record, the District cannot be held liable under Title IX for the "discrimination" perpetrated by Hetrick.  Accordingly, Douglas' Title IX claim must be dismissed.  The Court will deny Douglas' motion for summary judgment with respect to that claim and grant the corresponding portion of the District's motion for summary judgment.  ECF Nos. 55 & 59.

### B.    The Substantive Due Process Claims

Douglas brings her federal constitutional claims pursuant to 42 U.S.C. § 1983, which provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation

---

[16] Stevenson testified that he had unsuccessfully tried to contact a school administrator after speaking with K.E. on March 23, 2010.  ECF No. 59-72 at 26.

of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983.  This statutory provision does not create substantive rights.  *Maher v. Gagne*, 448 U.S. 122, 129, n. 11, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980)(observing that § 1983 "does not create substantive rights at all, but merely provides a remedy for the violation of rights conferred by the Constitution or other statutes").  A plaintiff cannot prevail in an action brought under § 1983 without establishing an underlying violation of a federal constitutional or statutory right.  *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119-120, 125 S.Ct. 1453, 161 L.Ed.2d 316 (2005).

The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law . . . ."  U.S. CONST., AMEND. XIV, § 1.  Although the precise language of the Due Process Clause refers only to the "process" by which an individual is deprived of a constitutionally-protected liberty or property interest, the Supreme Court has consistently maintained that the constitutional provision "guarantees more than fair process."  *Washington v. Glucksberg*, 521 U.S. 702, 719, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997).  The Due Process Clause has been construed to prohibit "certain government actions regardless of the fairness of the procedures used to implement them."  *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).  In this respect, the Fourteenth Amendment *substantively* prohibits a State from "abusing governmental power" or "employing it as an instrument of oppression."  *Davidson v. Cannon*, 474 U.S. 344, 348, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986).  In *County of Sacramento v. Lewis*, 523 U.S. 833, 847, n. 8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), the Supreme Court explained that where executive action is challenged on substantive due process grounds, "the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  If this question yields a positive answer, a reviewing court can proceed to consider whether the liberty or property interest infringed is sufficiently "fundamental" to be worthy of substantive due process protection.  *Lewis*, 523 U.S. at 847, n. 8 (referring to the egregiousness of an executive official's conduct as "an issue antecedent to any question about the need for historical examples of enforcing a liberty interest of the sort claimed"); *Nicholas v. Pennsylvania State University*, 227 F.3d 133, 138-143 (3d Cir.

2000)(explaining that only the deprivation of a "fundamental" liberty or property interest can give rise to a substantive due process claim).

The Supreme Court has described "conduct intended to injure in some way unjustifiable by any government interest" as "the sort of official action most likely to rise to the conscience-shocking level." *Lewis*, 523 U.S. at 849. The act of sexually assaulting an individual can *never* further a legitimate governmental interest. *Doe v. Taylor Independent School District*, 15 F.3d 443, 452 (5th Cir. 1994)(explaining that "no state interest" is furthered by a sexual assault, since "there is never any justification for sexually molesting a schoolchild"); *Whittaker v. County of Lawrence*, 674 F.Supp.2d 668, 700, n. 13 (W.D.Pa. 2009)(observing that "[a] government never has a legitimate interest in subjecting a woman to rape"). The "fundamental rights and liberty interests" protected by the Due Process Clause include an individual's right to "bodily integrity." *Glucksberg*, 521 U.S. at 720. In *Stoneking v. Bradford Area School District*, 882 F.2d 720, 727 (3d Cir. 1989), the United States Court of Appeals for the Third Circuit recognized that "a student's right to bodily integrity" under the Due Process Clause is broad enough to encompass his or her "right to be free from sexual assaults" perpetrated by a public school teacher. Douglas relies on *Stoneking* in support of her contention that Hetrick's sexual relationship with K.E. constituted a violation of K.E.'s Fourteenth Amendment right to bodily integrity. ECF No. 56 at 21.

### 1.    The Substantive Due Process Claims Against Hetrick

Douglas moves for summary judgment with respect to her substantive due process claims against Hetrick, arguing that a jury need only consider the issue of damages in light of Hetrick's "guilty" plea to three counts of aggravated indecent assault. ECF No. 56 at 21-22. Hetrick has not responded to Douglas' motion for summary judgment. The Court notes that Hetrick is not represented by the District's attorney, and that her answer to Douglas' amended complaint was filed by a separate attorney. ECF No. 45. When Douglas filed her motion for summary judgment, she did not include a certificate of service confirming that Hetrick's counsel had been served with a copy of the motion. ECF No. 55. Hetrick is presently incarcerated, and it is not clear to the Court whether she is aware of Douglas' motion for summary judgment.

The lack of a response from Hetrick does not independently justify the entry of summary judgment against her. *Anchorage Associates v. Virgin Islands Board of Tax Review & Tax Assessor*, 922 F.2d 168, 171 (3d Cir. 1990). Since Douglas has the burden of proof with respect

to her claims, the Court has an obligation to consider whether the "facts specified" in her motion entitle her to a judgment as a matter of law. *Id.* at 175. That is especially true in this instance, since Hetrick may not even know that Douglas' motion is pending. Under the present circumstances, the proper course of action is to provide Hetrick with notice of the pending motion and a renewed opportunity to file a response. FED. R. CIV. P. 56(e)(1), (4).

     *Stoneking* involved a school employee's alleged use of "physical force, threats of reprisal, intimidation and coercion to sexually abuse and harass" a female student over the course of several years. *Stoneking*, 882 F.2d at 722. The present case appears to be different. As far as the Court can tell, K.E.'s relationship with Hetrick was consensual. Hetrick's conduct was illegal under Pennsylvania law only because of the age difference between herself and K.E., and because K.E. had not yet attained the age of 16. 18 PA. CONS. STAT. § 3125(a)(8). K.E.'s first intimate encounter with Hetrick occurred only four months before her sixteenth birthday. ECF No. 55 at ¶ 113; ECF No. 59 at ¶ 6. When the relationship ended, K.E.'s birthday was only three weeks away. ECF No. 55 at ¶ 132-134; ECF No. 59 at ¶ 6. In the absence of force or coercion of some kind, Hetrick's conduct would not have been illegal under Pennsylvania law prior to 1995.[17] 1990 Pa. Laws 4, § 5; *Commonwealth v. Decker*, 698 A.2d 99, 100, n. 2 (Pa.Super.Ct. 1997). Although Hetrick's sexual encounters with K.E. were prohibited under Pennsylvania law, it does not necessarily follow that they were similarly prohibited under the Due Process Clause.[18] The "substantive rights" conferred on individuals by the Fourteenth Amendment are "self-executing." *City of Boerne v. Flores*, 521 U.S. 507, 524, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). The contours of those rights do not turn on the intricacies of state law. *United Artists Theatre Circuit, Inc. v. Township of Warrington*, 316 F.3d 392, 402 (3d Cir. 2003). The Supreme Court has cautioned against constructions of the Due Process Clause that "would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States." *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 47

---

[17] The statutory predecessor to Pennsylvania's aggravated indecent assault statute prohibited an individual who had attained the age of 18 from penetrating the "genitals or anus" of a child under the age of 14. 1990 Pa. Laws 4, § 5; *Commonwealth v. Decker*, 698 A.2d 99, 100, n. 2 (Pa.Super.Ct. 1997). The current version of the statute, which prohibits a person who is four or more years older than a child under the age of 16 from penetrating the child's "genitals or anus," was signed into law by Governor Thomas J. Ridge on March 31, 1995. 1995 Pa. Laws 10, § 9; *Decker*, 698 A.2d at 100, n. 2.

[18] There is no question that Pennsylvania may constitutionally prohibit Hetrick's conduct. *Lawrence v. Texas*, 539 U.S. 558, 578, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003)(recognizing a State's power to prohibit some forms of consensual sexual activity in order to protect "minors" and persons "situated in relationships where consent might not easily be refused").

L.Ed.2d 405 (1976).  For this reason, courts should not be eager to "constitutionalize broad swaths of state tort law" by defining substantive due process rights in overly general terms. *Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 404 (3d Cir. 2000).

Not every form of "inappropriate or unwanted touching" perpetrated by a state official is sufficiently egregious to violate the Due Process Clause.  *Hawkins v. Holloway*, 316 F.3d 777, 785 (8th Cir. 2003).  The sexual contact in this case, however, was clearly severe enough to implicate K.E.'s Fourteenth Amendment right to bodily integrity.  *Craig v. Lima City Schools Board of Education*, 384 F.Supp.2d 1136, 1147 (N.D.Ohio 2005)(finding a teacher's digital penetration of a female student's vagina to be conscience-shocking); *Hinkley v. Baker*, 122 F.Supp.2d 48, 52-53 (D.Me. 2000)(holding that a teacher's act of touching the breasts of a young female student could "shock the conscience").  The only question is whether the seemingly consensual nature of her relationship with Hetrick should weigh against a determination that Hetrick's conduct was conscience-shocking.  Some courts have found consensual sexual relationships between teachers and underage students to be violative of the Due Process Clause.[19] *Doe*, 15 F.3d at 451 (stating that the Constitution protects a 15-year-old student from "statutory rape"); *Doe v. Beaumont Independent School District*, 8 F.Supp.2d 596, 606 (E.D.Tex. 1998)(declaring "[c]onsensual sexual intercourse between a teacher and a minor student" to be actionable under § 1983 "where the teacher abuses his position under the color of state law to engage in the sexual acts").  Nonetheless, the Court is "reluctant to expand the concept of substantive due process" beyond the context of coercive activities without the benefit of adequate briefing from the parties, since "guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended."  *Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 S.Ct. 261 (1992).

---

[19] The Court is not persuaded by the reasoning employed in *Chancellor v. Pottsgrove School District*, 501 F.Supp.2d 695, 713 (E.D.Pa. 2007).  In *Chancellor*, the United States District Court for the Eastern District of Pennsylvania took the position that a consensual sexual relationship between a public school teacher and a student assigned to the teacher's class violates the student's substantive due process rights even if he or she has reached the applicable age of consent.  *Chancellor*, 501 F.Supp.2d at 713.  The rule adopted in *Chancellor* would essentially render some sexual relationships between consenting adults violative of the Fourteenth Amendment.  Such a result would be contrary to the Supreme Court's admonition that the Fourteenth Amendment "does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society."  *Daniels v. Williams*, 474 U.S. 327, 332, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).  The mere fact that the Constitution *permits* a State to protect individuals who are "situated in relationships where consent might not easily be refused" by enacting prophylactic restrictions on sexual activity does not mean that the Constitution *itself* provides such prophylactic protection.  *Lawrence v. Texas*, 539 U.S. 558, 578, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003).

For these reasons, Hetrick will be notified of Douglas' motion for summary judgment and ordered to file a response.  Douglas will be afforded an opportunity to file a responsive brief after Hetrick's response is filed.  If Hetrick refuses or fails to file a timely response, summary judgment will be entered against her without further inquiry.  *Stackhouse v. Mazurkiewicz*, 951 F.2d 29, 30 (3d Cir. 1991).  In the meantime, Douglas' motion will remain pending with respect to her substantive due process claims against Hetrick.  The Court's consideration of Douglas' remaining substantive due process claims will proceed on the assumption that Hetrick violated K.E.'s substantive due process right to bodily integrity.

> **2.      The Substantive Due Process Claims Against Craft**

Douglas seeks to hold Craft liable for the constitutional injuries suffered by K.E.  ECF No. 33 at ¶¶ 41-57.  According to Douglas, Craft may be liable under § 1983 for failing to implement a training program designed to prevent the sexual abuse of students and for failing to prevent contact between Hetrick and K.E. after discovering the abuse on March 24, 2010.  ECF No. 56 at 22.  Douglas apparently believes that Craft's liability for K.E.'s injuries depends on whether she was "*acting* in her personal capacity" rather than in her "official capacity."  *Id.* at 23 (emphasis added).

It is clear from Douglas' argument that she fundamentally misconstrues the distinction between personal-capacity claims and official-capacity claims.  The "capacity" in which a public official is *sued* has nothing to do with the "capacity" in which he or she has *acted*.  *Hafer v. Melo*, 502 U.S. 21, 27-31, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).  A plaintiff bringing a personal-capacity claim against an official seeks to hold the official personally liable for his or her conduct.  *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).  An award of damages entered against a personal-capacity defendant can be executed only against his or her "personal assets."  *Id.* at 166.  An official sued in his or her personal capacity may rely on personal defenses or immunities that are not available to governmental entities.  *Id.* at 166-167.  In contrast, an official-capacity action brought against a public official is not materially different from an action brought directly against the entity of which he or she is an agent.  *Hafer*, 502 U.S. at 25.  When an official-capacity defendant leaves office, his or her successor is "automatically substituted as a party" to the litigation by operation of law.  FED. R. CIV. P. 25(d).  An award of damages entered against an official-capacity defendant can be executed only against the employing governmental entity, since "an official-capacity suit is, in all respects other than

name, to be treated as a suit against the entity." *Graham*, 473 U.S. at 166.  The only immunities available to a defendant sued in his or her official capacity are those available to the governmental entity itself.  *Hafer*, 502 U.S. at 25.  This distinction does not relate to the "capacity" in which a defendant has *acted*, since a public official may be *personally* liable for his or her *official* acts.  *Hafer*, 502 U.S. at 27-31.

      The distinction between personal-capacity and official-capacity suits is most relevant in actions brought against state officials.  In most instances, the Eleventh Amendment bars actions brought by private parties against unconsenting States in federal court.  *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 779-780, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991).  The Supreme Court has not construed § 1983 as an abrogation of the States' Eleventh Amendment immunity.  *Quern v. Jordan*, 440 U.S. 332, 342-345, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).  Since an official-capacity suit against a state official is no different than a suit against the State itself, a state official sued in his or her official capacity for money damages is not a "person" subject to suit under § 1983.  *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 62-71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).  Nevertheless, under *Ex parte Young*, 209 U.S. 123, 154-160, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Eleventh Amendment does not bar official-capacity actions brought against state officials by private parties seeking prospective relief.  The Supreme Court has characterized the doctrine established in *Young* as "an expedient 'fiction' necessary to ensure the supremacy of federal law."  *Central Virginia Community College v. Katz*, 546 U.S. 356, 378, n. 14, 126 S.Ct. 990, 163 L.Ed.2d 945 (2006).  In accordance with this "fiction," a state official sued in his or her official capacity for injunctive relief is treated as a "person" amenable to suit under § 1983.  *Will*, 491 U.S. at 71, n. 10.  As a general rule, however, the relief sought by a plaintiff has no bearing on whether his or her claim is barred by the Eleventh Amendment. *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 58, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). Therefore, a plaintiff seeking injunctive relief against a state official must ordinarily bring an official-capacity action against that official rather than an action against his or her employing State.  *Burns v. Alexander*, 776 F.Supp.2d 57, 73 (W.D.Pa. 2011).

      Local governmental entities cannot avail themselves of the Eleventh Amendment immunity enjoyed by the States.  *Board of Trustees v. Garrett*, 531 U.S. 356, 369, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001); *Lincoln County v. Luning*, 133 U.S. 529, 530, 10 S.Ct. 363, 33 L.Ed. 766 (1890).  The Supreme Court held in *Monell v. Department of Social Services*, 436 U.S. 658,

690-691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), that municipal entities are "persons" subject to suit under § 1983. Douglas can proceed directly against the District without naming Craft as an official-capacity defendant. Consequently, Douglas' official-capacity claims against Craft will be dismissed on the ground that they are duplicative of her claims against the District. *Malone v. Economy Borough Municipal Authority*, 669 F.Supp.2d 582, 604-605 (W.D.Pa. 2009).

Douglas attempts to hold Craft personally liable for violating K.E.'s constitutional rights. In support of her claims, Douglas argues that Craft enjoyed "policymaking authority" under 24 PA. STAT. § 10-1081. ECF No. 56 at 22. Under that statutory provision, Craft was a non-voting member of Brookville's School Board during the 2009/2010 school year. 24 PA. STAT. § 10-1081. An official sued under § 1983, however, may only be held personally liable "for his or her own misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, ___, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). For this reason, Craft's status as Brookville's superintendent cannot serve as a basis for holding her liable for K.E.'s injuries. *Evancho v. Fisher*, 423 F.3d 347, 353-354 (3d Cir. 2005). Liability under § 1983 cannot be premised on a theory of *respondeat superior*. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). In order to proceed with her personal-capacity claims against Craft, Douglas must show that Craft was *personally* involved in Hetrick's misconduct. *Id.*

Douglas contends that Craft is personally liable under § 1983 for failing to implement a training program for teachers prior to Hetrick's actions in relation to K.E. ECF No. 56 at 22. The United States Court of Appeals for the Third Circuit has indicated that a supervisor may be personally liable under § 1983 if he or she "implements a policy or practice that creates an unreasonable risk" that a subordinate will perpetrate a constitutional violation, provided that the supervisor's "failure to change the policy or employ corrective practices" actually causes the subordinate to violate a person's constitutional rights. *Argueta v. United States Immigration & Customs Enforcement*, 643 F.3d 60, 72 (3d Cir. 2011). A plaintiff proceeding on such a theory, however, must do more than show that the defendant could have prevented the constitutional violation and failed to do so. *Black v. Indiana Area School District*, 985 F.2d 707, 712 (3d Cir. 1993). In this context, Douglas cannot hold Craft liable for K.E.'s injuries without demonstrating that Craft "played an affirmative role in bringing about the sexual abuse" perpetrated by Hetrick, and that Craft "acted with deliberate indifference to that abuse." *Id.*

The evidentiary record provides no support for Douglas' personal-capacity claims against Craft.  Craft became Brookville's superintendent in August 2009.  ECF No. 59-26 at 3.  K.E.'s sophomore year was Craft's first year in the position.  *Id.*  Craft played no role in formulating the District's preexisting policies.  *Id.* at 6-7.  She first became aware of Hetrick's relationship with K.E. on March 24, 2010.  *Id.* at 12-13.  At that point, the relationship had already ended.  Craft placed Hetrick on administrative leave immediately after speaking with her about the matter.  *Id.* at 27.  No action taken by Craft contributed to K.E.'s injuries.  *Stoneking*, 882 F.2d at 728-729 (permitting claims against school officials to go forward based on evidence that they had caused sexual assaults to occur by concealing prior allegations of sexual abuse, discouraging students from pursuing complaints of sexual abuse, giving offending teachers excellent performance evaluations, and forcing an alleged victim to publicly recant her allegations).

Douglas argues that Craft failed to follow the appropriate isolation, detention and reporting procedures after learning of the abuse on March 24, 2010.  ECF No. 56 at 23.  The alleged deficiencies in Craft's reaction to the abuse, however, have no bearing on Douglas' constitutional claims.  The last sexual encounter between Hetrick and K.E. occurred on March 22, 2010.  ECF No. 55-16 at 24.  K.E.'s right to bodily integrity was not infringed subsequent to that date.  In order to hold Craft personally liable for K.E.'s injuries, Douglas must establish a causal relationship between Craft's conduct and the violation of K.E.'s constitutional rights.  *Santiago v. Warminster Township*, 629 F.3d 121, 130 (3d Cir. 2010).  Since K.E.'s constitutional rights were not violated after Craft learned of the illicit sexual relationship, Douglas cannot show that Craft's actions or inactions *caused* Hetrick to infringe those rights.  Consequently, Douglas' personal-capacity claims against Craft must be dismissed.

### 3.        The Substantive Due Process Claims Against the District

A local governmental entity cannot be held vicariously liable under § 1983 for constitutional violations committed by its agents or employees.  *Berg v. County of Allegheny*, 219 F.3d 261, 275 (3d Cir. 2000).  Instead, a plaintiff may recover damages from a governmental entity only where his or her constitutional injuries are caused by the execution of the entity's "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."  *Monell*, 436 U.S. at 694.  A local governing body is clearly liable for constitutional injuries caused by the implementation or execution of "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's

officers."  *Id.* at 690.  "Similarly, an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law."  *Board of County Commissioners v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). Where a plaintiff alleges that a municipal "policy or custom" has caused a municipal employee to violate his or her constitutional rights, "stringent standards of culpability and causation must be applied" to ensure that the municipality is not subjected to liability solely because it happens to employ the individual responsible for the violation.  *Reitz v. County of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997).

Douglas appears to base her constitutional claims against the District, at least in part, on the District's alleged failure to train its employees to detect and report signs of sexual abuse. ECF No. 56 at 5-9; ECF No. 61 at 1-8.  In *City of Canton v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Supreme Court declared that "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."  Speaking through Justice White, the Supreme Court explained:

> It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees.  But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.  In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Harris*, 489 U.S. at 390 (footnotes omitted).  This line of reasoning applies with equal force to a school district's conduct in relation to its students.  *Stoneking*, 882 F.2d at 725.

As noted earlier, K.E. was neither a student in Hetrick's class nor a member of Brookville's softball team during the second semester of her sophomore year.  ECF No. 59-25 at 11-12; ECF No. 62-2 at 28-29.  Although Hetrick did not teach or coach K.E. during the course of their illicit sexual relationship, she used her authority as a teacher to facilitate some of the sexual encounters.  When Hetrick transported K.E. to and from school, she permitted K.E. to

utilize an entrance to the school building that was otherwise available only to members of the faculty.  ECF No. 55-10 at 14.  In addition, Hetrick provided K.E. with the written documentation that she needed to switch her study hall from Stevenson's classroom to Hetrick's classroom.  *Id.* at 17.  Given that Hetrick invoked her authority as a teacher to obtain greater access to K.E., she was presumably acting "under color of" Pennsylvania law when she improperly fondled K.E.'s breasts and genital area.[20]  *Becerra v. Asher*, 105 F.3d 1042, 1047 (5th Cir. 1997).

Earlier this year, in *Connick v. Thompson*, ___U.S.___, ___, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011), the Supreme Court observed that "decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights" if they have not been put on "notice that a course of training is deficient in a particular respect."  In order to establish the requisite "deliberate indifference" on the part of a municipal entity, a plaintiff must ordinarily produce evidence which demonstrates that the entity has declined to alter or improve its training regimen in the face of a "pattern of similar constitutional violations" perpetrated by untrained employees.  *Connick*, 131 S.Ct. at 1360.  Nonetheless, this line of reasoning does not "foreclose the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability."  *Brown*, 520 U.S. at 409.  Douglas asserts that prior instances of misconduct placed the District on notice that additional training was necessary to prevent teachers from sexually abusing their students.  ECF No. 56 at 13-15.

Wolfe was an assistant principal at Brookville during the 2002/2003 school year.  ECF Nos. 59 & 68 at ¶ 9.  At that time, James Estep ("Estep") was Brookville's principal.  *Id.* at ¶ 15. Gloria Shaffer ("Gloria"), a school custodian, reported on February 14, 2003, that she had seen Rick Fenstermaker ("Fenstermaker"), a Spanish teacher and basketball coach, place his arms around a student in his classroom.  *Id.* at ¶ 13.  After speaking with Gloria about the matter, Wolfe contacted Estep and began an investigation.  *Id.* at ¶¶ 14-15.  During the ensuing week, three male students confirmed that Fenstermaker had touched them inappropriately.  *Id.* at ¶ 16.

---

[20] A plaintiff satisfies the Fourteenth Amendment's "state action" requirement by establishing that the defendant state official acted "under color of" state law within the meaning of § 1983.  *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)(stating that "the statutory requirement of action 'under color of state law' and the 'state action' requirement of the Fourteenth Amendment are identical").

Estep contacted Brookville's Chief of Police, Ken Dwerok ("Dwerok"), on February 21, 2003, and informed him of the situation. *Id.* at ¶ 17. The Jefferson County District Attorney's Office later became involved in the investigation. *Id.* at ¶ 18. A surveillance camera was secretly placed in Fenstermaker's classroom to monitor his activities. *Id.* at ¶ 19. The camera later recorded Fenstermaker as he inappropriately touched a male student. *Id.* at ¶ 20. Indecent assault charges were ultimately brought against him. *Id.* at ¶ 21. The District initiated disciplinary proceedings against Fenstermaker by suspending him with pay. *Id.* at ¶ 22. On March 20, 2003, Fenstermaker was provided with the hearing required under *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).[21] ECF No. 59-4 at 1. After the hearing, David K. Monsour ("Monsour"), Brookville's superintendent, converted Fenstermaker's suspension with pay to a suspension without pay. *Id.* Fenstermaker responded in April 2003 by initiating the grievance procedures available to him under the applicable collective bargaining agreement. *Id.* at 4-6. A jury convicted Fenstermaker of indecent assault in December 2004. ECF Nos. 59 & 68 at ¶ 24. The District reported Fenstermaker's conduct and conviction to Pennsylvania's Department of Education ("Department") on January 7, 2005. ECF No. 59-5. On April 1, 2005, Fenstermaker formally presented Brookville with his notice of resignation. ECF No. 59-6. Fenstermaker's teaching certificate was revoked pursuant to Pennsylvania's Professional Educator Discipline Act [24 PA. STAT. § 2070.1a *et seq.*] on October 26, 2005. ECF No. 59-7.

During the 2006/2007 school year, John D. Johnson ("Johnson") was the District's superintendent and Wolfe was Brookville's principal. ECF Nos. 59 & 68 at ¶¶ 36-37. Kim Thomas ("Thomas") was a music teacher. ECF No. 59-75 at 8. Her daughter, Courtney Thomas ("Courtney"), was a student at Brookville. ECF No. 59-65 at 6. In March 2007, Thomas contacted Mark Heckman ("Heckman"), an assistant principal, and reported that Ray Ewing ("Ewing"), a biology teacher at Brookville, had encouraged Courtney to skip her classes and spend time alone with him. ECF Nos. 59 & 68 at ¶ 38; ECF No. 59-8 at 2. After learning of the allegations, Johnson went to the Thomas residence and read messages that Ewing had sent to Courtney. ECF No. 59-65 at 6. Johnson confronted Ewing with the allegations on March 19, 2007, and suspended him with pay. *Id.* A hearing was scheduled for March 26, 2007. ECF No.

[21] In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 535, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), the Supreme Court held that "a public employee who can be discharged only for cause" is constitutionally entitled to "notice and an opportunity to respond" before being discharged.

59-8 at 3. Ewing declined to attend the hearing and informed Johnson of his intent to resign. *Id.*
at 1. Ewing's suspension with pay was immediately converted to a suspension without pay. *Id.*
The matter was referred to the District Attorney's Office, but no criminal charges were brought
against Ewing. ECF Nos. 59 & 68 at ¶¶ 44-45. Ewing's employment with the District was
formally terminated on April 16, 2007. ECF No. 59-9 at 3. His misconduct was reported to the
Department on May 23, 2007. *Id.* at 3-4. The report ultimately resulted in a suspension of
Ewing's teaching certificate. ECF No. 59-65 at 7.

 Ray Doolittle ("Doolittle"), a guidance counselor employed by Brookville, exchanged
affectionate email messages with Brooke Lingenfelter ("Lingenfelter"), a female student, during
the spring and summer of 2007. ECF No. 55-4 at 50; ECF No. 55-5 at 5-9. He sometimes
referred to her as "dimples" or "kiddo." *Id.* Doolittle's messages frequently spoke about
Lingenfelter's relationship with God. *Id.* In a message sent to Lingenfelter on June 6, 2007,
Doolittle stated, "I will **always** support you as long as I feel that you are in line with God's will
for your life, and we'll tackle whatever happens <u>together</u>!" ECF No. 55-5 at 13 (boldface type
and underlining in original). Lingenfelter's mother and stepfather became concerned about the
tenor of Doolittle's messages and called the situation to Johnson's attention. ECF Nos. 59 & 68
at ¶¶ 94-96. The matter was referred to the Board of School Directors, the Brookville Police
Department, the PSP and the District Attorney's Office. *Id.* at ¶¶ 97-98, 101, 103. No evidence
of criminal wrongdoing was found. *Id.* at ¶¶ 99, 102 & 104. Although District personnel wanted
to speak with Lingenfelter, her parents would not allow the interview to take place.[22] *Id.* at ¶
110. In a letter dated October 12, 2007, Johnson informed Doolittle that the investigation would
remain open. ECF No. 55-6 at 6-7. The Department was made aware of Doolittle's conduct.
ECF Nos. 59 & 68 at ¶¶ 108-109. On February 8, 2008, the Department determined that there
was "probable cause to pursue disciplinary action" and advised that it would be conducting its
own investigation. ECF No. 55-6 at 20. February 25, 2009, was Lingenfelter's eighteenth
birthday. ECF No. 59-23 at 7. On that day, Wolfe and Sheila Hillwig ("Hillwig"), the District's
acting superintendent, interviewed Lingenfelter without her parents' consent. ECF Nos. 59 & 68
at ¶ 111. Lingenfelter denied that Doolittle had acted inappropriately. ECF No. 59-23 at 20.
She claimed that she had spoken with Doolittle about problems that she was having at home, and

---

[22] Douglas claims that the interview was forbidden by Lingenfelter's psychologist rather than by her parents. ECF
No. 68 at ¶ 110. Lingenfelter's parents, however, were the only individuals who had the legal authority to permit or
forbid her participation. *Herron v. Seizak*, 468 A.2d 803, 805 (Pa.Super.Ct. 1983).

that her mother had become resentful about the situation.  *Id.* at 8-9.  In a letter dated July 10, 2009, the Department informed the Board of School Directors that it had "decided not to initiate formal disciplinary proceedings" against Doolittle.  ECF No. 55-6 at 22.  After the investigation was closed, Doolittle remained in contact with Lingenfelter and ultimately attended her wedding.  ECF Nos. 59 & 68 at ¶¶ 116-117.

On May 16, 2008, Doolittle was running with Ian Hetrick ("Ian"), who was a 29-year-old graduate of Brookville.  ECF No. 59-28 at 1.  During the run, Ian stated that Ray Puller ("Puller"), a teacher at one of the District's elementary schools, had molested him in his bedroom 17 years earlier.  *Id.*  Ian and Puller were neighbors at the time of the alleged incident, and Ian was very close friends with Puller's son, Clint Puller ("Clint").[23]  ECF No. 59-55 at 1.  Ian claimed that Puller had entered his bedroom while he was sleeping and touched his penis through his shorts.  ECF No. 59-53 at 5, 10.  He told Doolittle that he had declined to say anything about the incident because of his close friendship with Clint.  ECF No. 59-28 at 1.  Doolittle reported Ian's allegation to Johnson on the morning of May 19, 2008.  ECF No. 59-55 at 1.  Johnson spoke with Puller about the allegation later that morning.  *Id.*  Puller vehemently denied that he had improperly touched Ian.  *Id.*  Johnson reported Ian's allegation to the District Attorney's Office and the Brookville Police Department.  ECF Nos. 59 & 68 at ¶ 67.  No report was filed with the Department.  *Id.* at ¶ 70.  The Court notes that, under Pennsylvania law, "[c]omplaints involving sexual abuse or exploitation of a child or a student may be filed beyond the date of the alleged occurrence or date of its discovery up until five years after the child or student reaches 18 years of age."  24 PA. STAT. § 2070.9(a).  Since more than five years had elapsed between Ian's eighteenth birthday and his decision to report the alleged abuse, any report filed with the Department would have been untimely.  The matter quickly concluded on June 23, 2008, when Puller decided to retire in order to take advantage of post-employment health benefits.  ECF Nos. 59 & 68 at ¶¶ 72-76.

Benji Smith ("Smith") served as Brookville's technology director during the 2008/2009 school year.  ECF Nos. 59 & 68 at ¶ 83.  He allegedly utilized the District's email system to pursue "unprofessional" relationships with two female teachers, Sarah Curry ("Curry") and Karen Ray ("Ray"), when he was supposed to be working.  *Id.* at ¶ 84.  Hillwig initiated

---

[23] The record indicates that Clint was killed in an accident in 2006, and that Ian ultimately named his own son after Clint.  ECF No. 59-28 at 1-2; ECF No. 59-55 at 1.

disciplinary proceedings against Smith, Curry and Ray on May 1, 2009.  ECF Nos. 59-10, 59-12 & 59-13.  A hearing was held on May7, 2009.  ECF No. 59-11 at 3.  Smith and Curry resigned while the disciplinary proceedings were still underway.  ECF Nos. 59 & 68 at ¶¶ 87, 90.  In a letter dated May 14, 2009, Hillwig notified Ray that she had been indefinitely suspended without pay.  ECF No. 59-11 at 1, 3.  On May 22, 2009, Ray initiated the grievance process available to her under the applicable collective bargaining agreement.  *Id.*  Her grievance was denied on January 4, 2010.  *Id.* at 11.  The denial of the grievance resulted in the termination of Ray's employment with the District.  ECF Nos. 59 & 68 at ¶ 93.

The evidentiary record does not establish a pattern of constitutional violations perpetrated by District employees.  The communications initiated by Ewing and Doolittle were not permitted to escalate into constitutional violations.  Ian's allegation against Puller does not implicate constitutional concerns, since the alleged incident was not connected to Puller's status as a teacher.[24]  *D.T. v. Independent School District*, 894 F.2d 1176, 1186-1192 (10th Cir. 1990)(holding that an elementary school's basketball coach had not acted "under color of" state law by molesting students while assisting at summer basketball camps that were not connected to school-related activities).  It is worth noting that Johnson launched an investigation into Puller's conduct even though 17 years had passed since the alleged incident.  The incidents involving Smith, Curry and Ray are totally irrelevant to the issues in this case.  The Constitution does not limit the circumstances in which consenting adults can pursue "unprofessional" relationships, and the allegedly "inappropriate" conduct of Smith, Curry and Ray did not threaten the *constitutional rights* of Brookville's students.  *Brown*, 520 U.S. at 411 ("A plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a *particular constitutional or statutory right* will follow the decision.")(emphasis added).  These three individuals, of course, ultimately lost their jobs anyway.  Only the conduct of Fenstermaker directly implicated the students' constitutional rights.[25]  The District cooperated

---

[24] The Court acknowledges that a teacher's off-duty misconduct can provide a school district with notice of his or her propensity to engage in conduct that could threaten the constitutional rights of students.  *Board of County Commissioners v. Brown*, 520 U.S. 397, 412, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)(suggesting that a governmental entity may be liable under § 1983 for hiring an employee with a known propensity to inflict a particular type of constitutional injury).

[25] The Due Process Clause does not prohibit every form of "inappropriate or unwanted touching" engaged in by a public official.  *Hawkins v. Holloway*, 316 F.3d 777, 785 (8th Cir. 2003).  It is not clear whether Fenstermaker's unlawful conduct was sufficiently egregious or invasive to violate the Due Process Clause.  That issue is inconsequential in the present context.  *Board of County Commissioners v. Brown*, 520 U.S. 397, 409, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)(acknowledging "the possibility that evidence of a single violation of federal rights,

with the relevant law enforcement personnel and brought Fenstermaker to justice shortly after learning of his illegal conduct.

Douglas does not deny that the District responded forcefully to the alleged misconduct of these individuals.  The crux of her argument is that the District did not *inform* its teachers of such misconduct or alter its training programs in response thereto.  ECF No. 56 at 6-7.  This line of reasoning does not provide a sound basis for holding the District liable for K.E.'s injuries.  The District's responsiveness to the allegations against Fenstermaker, Ewing, Doolittle, Puller and Hetrick belies Douglas' assertion that it was "deliberately indifferent" to the constitutional rights of its students.  *Brown*, 520 U.S. at 410 (describing the "deliberate indifference" standard as a "stringent standard of fault" requiring evidence that "a municipal actor disregarded a known or obvious consequence" of his or her conduct).  Furthermore, the relevant inquiry relates to the "substance of the training" provided by a governmental entity rather than to the "particular instructional format" chosen.  *Connick*, 131 S.Ct. at 1363.  The District was not specifically required to inform its employees of the misdeeds committed by others on prior occasions.  *P.H. v. School District of Kansas City*, 265 F.3d 653, 661 (8th Cir. 2001)("A handbook need not spell out every specific factual scenario of sexual abuse or harassment that is prohibited in order to be effective.").

Even if Douglas could establish that the District was "deliberately indifferent" to the constitutional rights of its students, she would not be able to show that the District's allegedly inadequate training regimen *caused* Hetrick to violate K.E.'s constitutional rights.  *Carswell v. Borough of Homestead*, 381 F.3d 235, 244-245 (3d Cir. 2004).  When Hetrick was hired to teach at Brookville, she was required to view a training film pertaining to the abuse of children.  ECF No. 59-20 at 4.  She signed a form acknowledging that she understood her obligation to report known instances of "sexual exploitation" to the relevant authorities.  *Id.* at 3-4.  She was specifically made aware of the District's responsibility to address claims of "sexual harassment" under Title IX.  *Id.* at 1-2.  Given that Hetrick's conduct in relation to K.E. was obviously wrong, her actions cannot reasonably be attributed to the District's alleged failure to train her accordingly.  *Connick*, 131 S.Ct. at 1363 (observing that "recurring constitutional violations are not the 'obvious consequence' of failing to provide prosecutors with formal in-house training

---

accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting *an obvious potential for such a violation*, could trigger municipal liability")(emphasis added).

about how to obey the law"); *Stoneking*, 882 F.2d at 727 (remarking that "a teacher's molestation of a student could not possibly be deemed an acceptable practice").  When her illicit relationship with K.E. was discovered, Hetrick immediately knew that she was in serious legal trouble.  ECF No. 55 at ¶¶ 134, 149-151.  It cannot be doubted that Hetrick's shortcomings "resulted from factors other than a faulty training program."  *Harris*, 489 U.S. at 391.  The content of a municipal defendant's training program is of little relevance in a case involving an employee's willful violation of known legal restrictions.  *Id.* (indicating that "mistakes" made by "adequately trained officers" say "little about the training program" provided by their employing entity).

Stevenson knew from his conversations with Shaffer that Hetrick and K.E. had been sending each other text messages.  ECF No. 59-69 at 1.  He also knew that K.E. had switched her study hall from his classroom to Hetrick's classroom.  ECF No. 59-72 at 25.  When questioned about what he had known prior to March 23, 2010, Stevenson testified that he had viewed Hetrick's relationship with K.E. as something akin to a mother/daughter relationship.  *Id.* at 28. He stated that he had not believed the relationship to be "sexual in nature."  *Id.*  Stevenson further explained that K.E. had attributed her decision to move her study hall to Hetrick's classroom to her need for tutoring in mathematics.  *Id.* at 25.

Douglas posits that Hetrick's abuse of K.E. might have been deterred or stopped if Stevenson had intervened sooner.  ECF No. 56 at 8.  She claims that Stevenson did not receive proper training about his duty to report signs of child abuse.  *Id.*  The problem with Douglas' argument is threefold.  First of all, Stevenson was aware of facts that would explain Hetrick's close relationship with K.E. even in the absence of inappropriate activity.  He is the one who had recommended that K.E. take piano lessons from Hetrick.  ECF No. 62-1 at 31.  K.E. had told him that she was being tutored by Hetrick.  ECF No. 59-72 at 25.  Second, it is undisputed that Stevenson prefaced his discussion with Shaffer and K.E. on March 23, 2010, with a warning that he would be legally obligated to report any information suggesting that K.E. had been mentally, physically or emotionally harmed.  ECF No. 59-69 at 2; ECF No. 59-70 at 26.  Stevenson's knowledge of this obligation directly contradicts Douglas' assertion that he had not been previously advised of his responsibility to report evidence of abuse.  Finally, the questionable communications initiated by Ewing and Doolittle never resulted in constitutional violations. Fenstermaker's misconduct did not involve the improper use of text messages.  Therefore, the District was never placed on notice that a teacher's sexual exploitation of a student would be "a

plainly obvious consequence" of its alleged decision not to train teachers and school employees to investigate or report the content of text messages exchanged between teachers and students. *Brown*, 520 U.S. at 412.

Richard A. Wallace ("Wallace") and Jacob L. Lewis ("Lewis"), both of whom were teachers at Brookville during the 2009/2010 school year, served as parking lot monitors.  In that capacity, they were expected to observe students entering the school building in order to ensure that inappropriate conduct was not occurring.  ECF No. 57-1 at 4-5.  Wallace and Lewis both testified that they had seen Hetrick and K.E. enter the building together on several occasions. ECF No. 55-18 at 23-24; ECF No. 57-1 at 11.  Wallace apparently believed that K.E. was Hetrick's daughter.  ECF No. 55-18 at 23.  Lewis stated that he had known Hetrick's children at the time, and that he had never believed K.E. to be Hetrick's daughter.  ECF No. 57-1 at 12. Brookville's Policy No. 440, which was in effect during the 2009/2010 school year, prohibited teachers from transporting students in their personal vehicles without the authorization of the School Board.  ECF No. 55-18 at 18.  Wallace and Lewis were not aware of Policy No. 440 when they served as parking lot monitors.  ECF No. 55-18 at 16; ECF No. 57-1 at 19.

Douglas suggests that Hetrick's abuse of K.E. could have been stopped earlier if Wallace and Lewis had received proper training about Policy No. 440.  ECF No. 56 at 8.  She intimates that the District is liable under § 1983 for failing to provide such training.  *Id.*  As an initial matter, it is not entirely clear whether Hetrick violated Policy No. 440 when she transported K.E. to and from school.  Wolfe testified that he had understood the policy to require teachers to use school vans, rather than their personal vehicles, when transporting students to and from school-related events such as competitions and field trips.  ECF No. 59-76 at 8-9.  Under Wolfe's interpretation of the policy, Hetrick was not prohibited from providing K.E. with rides to and from school.  *Id.*  Even if Douglas' construction of the policy is correct, however, the District's failure to train Wallace and Lewis about that policy cannot serve as a basis for liability in this context.  The District's "deliberate indifference" as to whether its own policies were being enforced is not the same "indifference" that is relevant to the inquiry applicable under § 1983. *Brown*, 520 U.S. at 411.  In order to hold the District liable for K.E.'s injuries under these circumstances, Douglas must show that a teacher's sexual abuse or molestation of a student was the "plainly obvious consequence" of the District's failure to make parking lot monitors aware of Policy No. 440.  *Id.*  A teacher's decision to provide a student with a ride to and from school

33

does not inherently threaten the student's welfare.  Indeed, there may be instances where such an arrangement would provide a student with the safest available means of transportation. Consequently, the District's "indifference" to the requirements of Policy No. 440 cannot be equated with its alleged "indifference" to K.E.'s constitutional rights.  *Id.* ("A plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a *violation of a particular constitutional or statutory right* will follow the decision.")(emphasis added).

   The record indicates that Andrea Blair ("Blair"), Wolfe's secretary during the 2009/2010 school year, viewed recordings from a surveillance camera depicting Hetrick and K.E. entering and leaving the school building together in January 2010.  ECF No. 55-18 at 10.  The recordings were apparently lost or misplaced when Wolfe left Brookville to become the superintendent of the Punxsutawney School District.  *Id.* at 9.  Relying on *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 334 (3d Cir. 1994), Douglas contends that the District's failure to produce the recordings should give rise to an inference that the depictions of Hetrick and K.E. entering and leaving the building would have been damaging to its defense.  In order for the rule established in *Brewer* to apply, "it must appear that there has been an actual suppression or withholding of the evidence" in question.  *Brewer*, 72 F.3d at 334.  Douglas points to nothing in the record which suggests that the recordings were deliberately altered or destroyed.  ECF No. 56 at 12.  Moreover, she cannot establish that the District is liable under § 1983 even if District officials knew all along that Hetrick and K.E. were entering and leaving the building together.  In order for municipal liability to attach in this context, the "identified deficiency" in the District's training program must be "closely related" to K.E.'s "ultimate injury."  *Harris*, 489 U.S. at 391. It is undisputed that, during the relevant period of time, K.E. was taking piano lessons at Hetrick's residence immediately after school.  ECF No. 62-1 at 32.  In light of the many innocuous reasons why a student may frequently enter and leave a school building with a teacher, Blair's alleged failure to investigate the matter further cannot be fairly attributed to a training deficiency pertaining to a student's right to bodily integrity.  *Harris*, 489 U.S. at 389-392.

   Markle served as Brookville's "resource officer" during the 2007/2008 school year.  ECF No. 59-68 at 3.  In that capacity, he sometimes stayed on school grounds while classes were in session so that disturbances could be dealt with expeditiously.  *Id.* at 16.  The position was discontinued after the school year because of opposition from a member of the School Board.  *Id.*

Douglas speculates that K.E.'s injuries might have been prevented if the District had employed a "resource officer" during the 2009/2010 school year.  ECF No. 56 at 17.  Even if the presence of a police officer could have prevented some or all of Hetrick's sexual encounters with K.E., "[s]uch a claim could be made about almost any encounter resulting in injury."  *Harris*, 489 U.S. at 391.  The alleged causal link between the District's elimination of Markle's position and Hetrick's ability to assault K.E. on school grounds is far too attenuated to subject the District to liability under § 1983.  *Brown*, 520 U.S. at 405 (explaining that "rigorous standards of culpability and causation must be applied" whenever a plaintiff claims that a governmental entity "has not directly inflicted an injury" but has nevertheless "caused an employee to do so").

The arguments advanced by Douglas concerning the omissions of Stevenson, Wallace, Lewis, Blair and other District officials are problematic for another reason.  In any failure-to-train case, the governmental entity's failure to provide proper training is a step removed from the constitutional violation resulting from that failure.  *Oklahoma City v. Tuttle*, 471 U.S. 808, 822-823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)(plurality opinion).  That is why a plaintiff seeking to hold a governmental entity liable in this context must demonstrate that his or her injury would have been avoided if the *offending employee* had been "trained under a program that was not deficient in the identified respect."  *Harris*, 489 U.S. at 391.  Where a plaintiff attempts to extend this theory to a government's failure to train *other employees* to detect or report the actions of an offending employee, the government's alleged inaction is "a good deal further removed from the constitutional violation."  *Tuttle*, 471 U.S. at 822.  For this reason, it is not clear whether such an attenuated failure-to-train claim is *ever* cognizable under § 1983.  *Connick*, 131 S.Ct. at 1359 ("In *limited* circumstances, a local government's decision not to train certain employees about *their* legal duty to *avoid violating* citizens' rights may rise to the level of an official government policy for purposes of § 1983.")(emphasis added).  In any event, the United States Court of Appeals for the Third Circuit recently rejected a similar type of claim on the ground that no pattern of prior sexual abuse had been identified.  *Kline v. Mansfield*, 255 Fed.Appx. 624, 630 (3d Cir. 2007)(unpublished).  Since the record does not reveal a pattern of sexual exploitation stemming from the failure of Brookville's teachers to detect or report signs of child abuse, the Court need not consider the broader question of whether a school district's failure to provide this type of second-hand training can ever provide a legitimate basis for governmental liability under § 1983.

The Court notes that, in February 2010, Douglas discovered a green box containing pictures of Hetrick and K.E. while looking through K.E.'s closet.  ECF No. 62-1 at 33.  K.E. had apparently been planning to give the box to Hetrick as a St. Valentine's Day present.  *Id.*  After discovering the box, Douglas cancelled K.E.'s remaining piano lessons and instructed Hetrick not to transport K.E. to and from school.  *Id.* at 33-35.  Hetrick advised Douglas that it was normal for teenagers to develop "crushes" on their teachers.  *Id.* at 35.  Douglas did not report the matter to District personnel.  She apparently told Wolfe and Craft on March 24, 2010, that she had not previously called the situation to their attention because of her erroneous belief that nothing inappropriate had taken place.  ECF No. 59-74 at 4.  The fact that Douglas views her discovery of the green box differently in hindsight than she did in February 2010, like Stevenson views the text messages differently in hindsight than he did prior to March 23, 2010, further serves to illustrate why the District is not responsible for the crimes committed by Hetrick.

Local governments sued under § 1983 are responsible only for "their *own* illegal acts." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)(emphasis in original).  No decision made by the District constituted the "functional equivalent" of a decision to infringe K.E.'s Fourteenth Amendment right to bodily integrity. *Harris*, 489 U.S. at 395.  It was Hetrick's own misconduct, rather than a deficient training program, that was the "moving force" behind the constitutional violations alleged.  *Brown*, 520 U.S. at 404.  No reasonable trier of fact could conclude otherwise.  Douglas cannot hold the District liable for K.E.'s injuries solely because it employed Hetrick during the relevant period of time.  *Connick*, 131 S.Ct. at 1359.  Therefore, the motion for summary judgment filed by Douglas will be denied with respect to the claims asserted against the District and Craft.  ECF No. 55.  The motion for summary judgment filed by the District and Craft will be granted in its entirety.  ECF No. 59.

## C.     The Battery Claims

Douglas moves for summary judgment with respect to her battery claims against Hetrick. ECF No. 56 at 21-22.  She relies on Hetrick's "guilty" plea to three counts of aggravated indecent assault in support of her motion.  *Id.*  As discussed earlier, Douglas never filed a certificate of service confirming that a copy of her motion had been served on Hetrick's counsel. ECF No. 55.  Hetrick has not responded to the motion, and the Court is not sure whether she is even aware of it.  Given that Douglas has the burden of proof, the Court cannot grant summary

judgment in her favor without considering whether the "facts specified" in her motion entitle her to a judgment as a matter of law. *Anchorage Associates*, 922 F.2d at 175.

It is undisputed that Hetrick pleaded "guilty" to three counts of aggravated indecent assault. ECF Nos. 55 & 62 at ¶ 121. Hetrick's conviction stems from the fact that she digitally penetrated K.E.'s vagina while K.E. was below the age of 16. 18 PA. CONS. STAT. § 3125(a)(8). Pennsylvania's criminal statutes generally prohibit an individual who is more than four years older than a child under the age of 16 from engaging in sexual activities with that child. 18 PA. CONS. STAT. §§ 3122.1, 3123(a)(7), 3125(a)(8), 3126(a)(8). Sexual activities with a child under the age of 13 are prohibited regardless of the age difference between the offending individual and the child. 18 PA. CONS. STAT. §§ 3121(c), 3123(b), 3125(a)(7), 3126(a)(7). The different standards applicable under Pennsylvania law reflect a legislative judgment that while a child under the age of 13 is incapable of consenting to sexual activity in any circumstance, a child between the ages of 13 and 15 can arguably consent to sexual activity with a slightly older individual. *Albert*, 758 A.2d at 1152-1154.

In *C.C.H. v. Philadelphia Phillies, Inc.*, 940 A.2d 336, 349 (Pa. 2008), the Pennsylvania Supreme Court held that a civil defendant could not defeat a battery claim brought by a child under the age of 13 by contending that the child had consented to sexual activity. In so holding, the Pennsylvania Supreme Court relied on the fact that the criminal law had categorically classified children under the age of 13 as being "incompetent as a matter of law to consent to sexual contact." *C.C.H.*, 940 A.2d at 349. The criminal statutes relating to children between the ages of 13 and 15, however, are less absolute. 18 PA. CONS. STAT. §§ 3122.1, 3123(a)(7), 3125(a)(8), 3126(a)(8). It is not entirely clear whether the reasoning employed in *C.C.H.* should be extended to cover a situation involving sexual contact between an older adult and a 15-year-old child. Although the age difference between Hetrick and K.E. rendered Hetrick's conduct indefensible under Pennsylvania's aggravated indecent assault statute, the sexual relationship appears to have been consensual in all other respects.

In view of the fact that Hetrick has not responded to Douglas' motion for summary judgment, the Court will inform her of its pendency and order her to file a response. Douglas will be afforded an opportunity to supplement her arguments after Hetrick's response is filed. Summary judgment will be entered against Hetrick if she does not respond to this Court's order in a timely manner. *Stackhouse*, 951 F.3d at 30. After the positions of the parties are clearly

articulated, the Court will be in a better position to determine whether the apparently consensual nature of K.E.'s sexual encounters with Hetrick should have any bearing on whether Hetrick is liable for battery under Pennsylvania law. *C.C.H.*, 940 A.2d at 342-350. Douglas' motion for summary judgment will be addressed shortly after the requested submissions are filed.

Pursuant to this Court's order of July 1, 2011, motions for summary judgment were due on August 19, 2011. ECF No. 49. Hetrick's counsel received a copy of the order. *Id.* at 2. The deadline was extended to August 26, 2011, at the request of the parties. ECF Nos. 52 & 54. Hetrick has not filed a motion for summary judgment. Douglas' substantive due process and battery claims against Hetrick will proceed to trial in any event. The only remaining question is whether the trial will be limited to the issue of damages, or whether it will also include a liability phase. The claims against Hetrick will not be dismissed if it is determined that the issue of consent precludes the entry of summary judgment against her. In that event, Douglas and Hetrick will both be free to introduce evidence pertaining to that issue. *Ortiz v. Jordan*, ___U.S.___, ___, 131 S.Ct. 884, 889, 178 L.Ed.2d 703 (2011)("Once the case proceeds to trial, the full record developed in court supersedes the record existing at the time of the summary judgment motion.").

**V.    Conclusion**

For the reasons stated in this opinion, the Court will deny Douglas' motion for summary judgment with respect to Counts I, II and V of the amended complaint. ECF No. 31 at ¶¶ 18-32, 41-57. The motion for summary judgment filed by the District and Craft will be granted in its entirety, and they will be dismissed as defendants in this case. ECF No. 59. Douglas' motion for summary judgment will remain pending with respect to Counts III and IV of the amended complaint until the parties supplement their filings and inform the Court of their respective positions. ECF No. 33 at ¶¶ 33-40. The applicable deadlines for these filings will be specified in an order following this opinion.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

LISA DOUGLAS, individually and as )
the parent and natural guardian of K.E., )
a minor, )
       )
      **Plaintiff,** )
       )
      **v.** )      **Civil Action No. 10-1087**
       )
BROOKVILLE AREA SCHOOL )
DISTRICT; SANDRA CRAFT, )
Superintendent of the Brookville Area )
School District; and KARIN HETRICK, )
       )
      **Defendants.** )

## ORDER OF COURT

AND NOW, this 8th day of December, 2011, it is hereby **ORDERED, ADJUDGED,**

and **DECREED** that the MOTION FOR SUMMARY JUDGMENT filed by Defendants

Brookville Area School District and Sandra Craft (*ECF No.59*) is **GRANTED**, and that each of

these Defendants are dismissed from this case.

The MOTION FOR SUMMARY JUDGMENT filed by Plaintiff Lisa Douglas (*ECF No.

55*) is **DENIED** with respect to Counts I, II and V of the Amended Complaint.  Counsel for

Defendant Karin Hetrick is hereby **ORDERED** to respond to Plaintiff Lisa Douglas' Motion for

Summary Judgment on or **before January 6, 2011**.  If Plaintiff Lisa Douglas wishes to file a

responsive brief, she must do so on or before **January 20, 2011**.

The caption of this case is hereby amended to read as follows:

**LISA DOUGLAS, individually and as the
parent and natural guardian of K.E., a minor,**
      **Plaintiff,**


**v.**

**KARIN HETRICK,**
      **Defendant.**

BY THE COURT:


s/Terrence F. McVerry
United States District Judge


cc:    **James J. Ross, Esquire**
      Email: jross@brf-law.com

      **Thomas E. Breth, Esquire**
      Email: tbreth@dmkcg-law.com

      **Robbie M. Taylor, Esquire**
      Email: taylorlaw@windstream.net
      **Blair H. Hindman, Esquire**
      Email: gnhh@choiceonemail.com

      **Karin Hetrick**
      Inmate No. OR4920
      SCI Cambridge Springs
      451 Fullerton Avenue
      Cambridge Springs, PA 16403-1238